Geaham, Judge,
delivered the opinion of the court:
The statutes cited on behalf of the parties in this case are as follows:
Section 1766 of the Eevised Statutes:
“ No money shall be paid to any person for his compensation who is in arrears to the United States, until he has accounted for and paid into the Treasury all sums for which he may be liable. In all cases where the pay or salary of any person is withheld.in pursuance of this section, the accounting officers of the Treasury, if required to do so by the party, his agent or attorney shall report forwith to the-Solicitor of the Treasury the balance due; and the solicitor shall, within sixty days thereafter, order suit to be commenced against such delinquent and his sureties.”
The act of July 16, 1892, 27 Stat. 177:
“ The pay of officers of the Army may be withheld under-section 1766 of the Eevised Statutes on account of an indebtedness to the United States admitted or shown by the judgment of a court, but not otherwise unless upon a special order issued according to the discretion of the Secretary of War.”
Section 145 of the Judicial Code:
“ The Court of Claims shall have jurisdiction to hear and', determine the following matters: * * *
“ Third. The claim of any paymaster, quartermaster, commissary of subsistence, or other disbursing officer of the United States, or of his administrators or executors, for relief from responsibility on account of loss by capture or-otherwise, while in the line of his duty, of Government funds,, vouchers, records, or papers in his charge, and for which such officer was and is held responsible.”
*333 Section 147 of the Judicial Code:
“ Whenever the Court of Claims ascertains the facts of any loss by any paymaster, quartermaster, commissary of subsistence, or other disbursing Officer, in the cases hereinbefore provided, to have been without fault or negligence on the part of such officer, it shall make a decree setting forth the amount thereof, and upon such decree the proper accounting officers of the Treasury shall allow to such officer the amount so decreed as a credit in the settlement of his accounts.”
The facts, so far as they appear, are set forth in the findings. A brief review of a few of them is necessary.
The plaintiff, a captain in the Quartermaster Corps of the Army, was in October, 1919, assigned to duty as superintendent of the United States Quartermaster Army retail store at Atlanta, Ga. The proof does not disclose what his duties and responsibilities were as superintendent except as the word “ superintendent ” may suggest. The volume of business in the store was large. Six persons were employed in different capacities, as appears from the insurance policy — a finance clerk, three cashiers, a stamp clerk, and a bookkeeper by the name of David S. Wells. It was the custom for one of the cashiers to collect the money received from a day’s business and hand it over to the said Wells, whose duty it was to receive and receipt for the same. What disposition it was his duty to make of the money after receiving it does not appear.
On November 10 one of the cashiers handed Wells the sum of $2,557.60, which he received and receipted for. Between that time and the next day the money was lost. No other facts in connection with its disappearance are shown. A board of officers, convened for the purpose of inquiring into and reporting on the facts, found that the money was lost through criminal negligence or was feloniously abstracted.
In September, 1919, prior to the assignment of the plaintiff to duty as superintendent, there had been taken out an insurance policy with the National Surety Co., of New York, in the sum of $50,000, protecting against criminal conduct on the part of certain employees, such as personal dishonesty, forgery, theft, embezzlement, or wrongful conversion. It applied to the six employees of the store heretofore mentioned, and certain amounts were fixed as to each in an at *334 tached schedule. Among these employees was the said Wells and the amount fixed as to him was $10,000.
Wells was employed in the store before the plaintiff assumed his duties as superintendent, and the insurance policy was taken out before that time. It does not appear that he had any authority to discharge Wells or any of the employees. As stated, a large volume of business was conducted at the store. It is admitted that plaintiff, as far as the loss is concerned, was free from any fault or negligence, and a board of officers so found. It is not shown that the lost sum was ever in the actual possession of the plaintiff or that it had been deposited to his account or in any safe over which he had control or to which he had the combination. It does not even appear that he knew or should have known prior to the loss that this money had been received in the store by Wells.
After the loss of the money the said insurance company was notified of it. The evidence does not show who took out the policy or who had possession of it. The company not acknowledging liability, some one whose name is not given, placed the matter in the hands of the Attorney General, who transmitted it to the Solicitor of the Treasury for such action as was required, and the solicitor in turn sent the case to the district attorney at Atlanta with instructions to bring suit against the company. The district attorney brought a suit, not however until he had expressed a doubt as to his ability to prove conduct of the character covered by the policy. The insurance policy was not in the name of the United States nor any individual, but was drawn “to the superintendent U. S. Army Quartermaster retail store, Atlanta, Georgia, employer.”
The district attorney brought a suit in the name of the United States. The plaintiff was not consulted about the suit, and it does not appear that he knew of it, the matter having been taken in hand by the officials of the Government, presumably on the suggestion of the council of administration of the post exchange. The company defended denying liability and demanding proof. Thereafter the suit was dismissed on the payment by the company of $1,000 *335 in full satisfaction of the claim against it. The said sum was afterwards covered into the United States Treasury. This action was taken apparently on account of inability to prove conduct by Wells that came within the protection of the bond. It does not appear that plaintiff knew of or had anything to do with the settlement. There remained of the loss unsatisfied $1,557.60. The Solicitor of the Treasury gave the opinion to the Secretary of War that plaintiff was primarily responsible for this sum and suggested that there should be a stoppage of a portion of his salary for the purpose of paying the balance. Thereupon the Secretary of War issued an order directing that $50 a month should be deducted from plaintiff’s salary and appropriated to pay the balance stated. This sum was withheld from his pay for 14 months, at the end of which time the Secretary of War reached the conclusion that the plaintiff was not liable, wrote to the Solicitor of the Treasury for an opinion, and the latter concurring in the Secretary’s view recommended that the stoppage of plaintiff’s salary be suspended, and this was done.
It will be seen that $700 of plaintiff’s pay was withheld. He is asking relief under the provisions of paragraph 3 of section 145, and section 147, of the Judicial Code, heretofore cited.
An historical statement taken from the regulations of the War Department and the statutes is attached hereto.[1] The *336 general facts therein stated with regard to the organization, ownership, and conduct of post exchanges, such as the one of which plaintiff was superintendent, apply to the present case, as the regulations for the year 1917, which were in force at the time of the loss involved in this case are practically the same. They show that the stock in the post exchange was owned by the different organizations at the post, and *337 not the property of the Government, and that the post ■exchange was conducted by the council of administration appointed by the commanding officer at the post. The money lost in this case was the property of the post exchange and .not the property of the Government. This being so, the plaintiff was not in arrears through the loss thereof, and did not come within the provisions of section 1766 of the Re *338 vised Statutes, supra, prohibiting the payment of money to a person for his compensation who is in arrears to the United States.
This court in Hedrick v. United States, 16 C. Cls. 88, 104, held, construing section 1766, that where an employee is not liable to the Government nothing can be deducted from his compensation. Not only should the plaintiff not have been held and treated as liable for the loss, but the withholding of his pay was without authority of law.
This case is in effect a suit by the plaintiff to recover $700 withheld from his pay, to which claim the defendant, sets up what is equivalent to a counterclaim for the unpaid balance of the lost funds, amounting to $1,557.60. As the plaintiff should not have been held liable for this loss, the counterclaim should be and is hereby dismissed. The plaintiff, an officer' of the Army, has had his pay unjustly withheld and is entitled to recover $700. Judgment should, be entered for that amount, and it is so ordered.
Hat, Judge; Booth, Judge; and Campbell, Ghief Justice, concur.

 The office of sutler was first provided for by Section VII, article 3 of the Articles of War, on September 20, 1776, which directed all commanding officers in forts, barracks, and garrisons of the united States, to appoint certain persons as sutlers. The persons so appointed were required, in order to be “ permitted to suttle,” to supply certain specified articles to the troops. The sutlers during the time that their offices were in force supplied the troops with such merchandise and other articles as were necessary for them under the circumstances, including beers, wines, and other alcoholic liquors, under strict regulations by the War Department.
The office of Army sutler was abolished by section 25 of the act of July 28, 1866, 14 Stat. 332, 336, and the subsistence office of the Army was authorized and required to furnish such supplies as from time to time might be designated by the Inspectors General of the Army, to be sold to the officers and enlisted men at cost price, “ and if not paid for when purchased, a true account thereof shall be kept and the amount due the Government shall be deducted by the paymaster at the payments next following such purchase.”
After abolishing the office of sutler, what were known as “ post traderships ” were established. These post traders were in reality merchants licensed to do business with the Army. At about the same time canteens were organized by *336 the officers of regiments and other commands, out of their own funds, and were conducted independently of their official duties. These were in the nature of social clubs, and sold manufactured tobacco, cigars, beer, wine, and other alcoholic liquors. These organizations were held liable to the internal revenue tax, the same as social clubs in the cities selling tobacco and liquors.
By the act of January 28, 1893, 27 Stat., 426, post traderships were also abolished, after which post exchanges were established, superseding both the post traderships and the Army canteen. Post exchanges were first organized under General Order No. 10, Adjutant General’s Office, February 1, 1889. The regulations of the War Department establishing and governing post exchanges as they now exist were published in 1895. under the canteen system stoppages against the pay of Army officers were not allowed by the accounting officers of the Treasury. After the establishment of post exchanges under the regulations of 1895 they were recognized as instrumentalities or agencies of the Government and were held by the Treasury Department to be nontaxable under the internal revenue laws; and stoppages against the pay of officers and enlisted men were held to be legal for reimbursement to post exchanges of losses for which such officers or enlisted men were responsible. Post exchanges were organized through the joint efforts of the Government and the individual soldiers. They were established by the commanding officers at the different posts and stations, and were managed by such officers and the post exchange councils of administration. The Government made appropriations for the construction, equipment, and maintenance of suitable buildings at military posts and stations for the conduct of the post exchanges, including repairs to Young Men’s Chuistian Association buildings erected at private expense and taken over by the post exchanges, and during the last war included in such appropriations provisions for the salaries and traveling expenses of civilians in the hostess, and library services. Act of May 31, 1902, 32 Stat. 282; act of August 24, 1912, 37 Stat. 569, 582, and the act of March 2, 1923, 42 Stat. 1380'.
under the regulations in force in 1919 the expenses of fitting up the quarters of the exchange and procuring the necessary articles of the first stock and fixtures were met by an assessment upon the funds of the several organizations, contributing to the institution, or these might be contracted for or procured on credit. When procured on credit the bills were required to be paid from the first profits, and it was to be distinctly understood that the officers incurring-the debt were responsible for the payment, and not the Government.
The Quartermaster Corps was authorized to sell for cash to post exchanges-at cost, with price of transportation added, such articles of furniture and fixtures as could be spared from stock on hand. The membership of the exchange was required to be from organizations, companies, or detachments. When a post exchange is first established the post exchange council must fix the amount necessary for its establishment, and when this amount has been determined it is divided into a number of shares equal to the maximum authorized strength of all organizations, companies, and detachments desiring to become members, the amount to be paid by each, organization, company, and' detachment to be determined by multiplying the value of one share by its authorized enlisted strength. Whenever a company or detachment applies for membership in an exchange already authorized, a careful estimate of the market *337 value of tie property will be made by a disinterested officer, probably a field •officer, who, whenever practicable, will be assisted in the performance of his ■duties by a representative of each party in interest. These appraisers will be designated by the post commander. The estimate must be approved by the •commanding officer or submitted on appeal to the department commander, whose decision will be final. A company joining an exchange, when unable to pay its ¡assessment in cash, may be charged with it, and such charge may be liquidated ■from the company’s share of the profits of the exchange.
The exchange, doing its full work, should embrace the following sections:
(a) A well-stocked general store in which such goods are kept as are usually ■required at military posts, including tickets to approved entertainments;
(b) A well-kept restaurant, supplied with as great a variety of supplies as circumstances will permit, such as tea, coffee, cocoa, nonalcoholic drinks, soup, fish, sandwiches, cooked and canned meats, pastries, etc.;
(c) Reading and recreation rooms supplied with books, periodicals, and other reading matter; billiard and pool tables, bowling alleys, and facilities for other “indoor games;
(d) A well-equipped gymnasium, possessing also requisite paraphernalia for ■outdoor sports, such as baseball, football, golf, cricket, etc.;
(e) Barber shop, laundry, tailor shop, and shoe-repair shop.
No other features than those enumerated shall be added to the business of ■■the exchange without the authority of the War Department.
The funds for the purchase of the stores and supplies are furnished entirely 'by the enlisted men. The exchange officer in charge of the business and the ¡assistant exchange officer, if any, are commissioned officers appointed by the ■commanding officer of the post, camp, or station, and enlisted men, or, if necessary, civilians, constitute the employees. The civilians are paid out of the post •exchange funds. Post exchange funds are kept entirely separate and distinct from united States funds. The profits are used in certain specified ways. A reserve is maintained and a percentage of the surplus profits is distributed •among the shareholders. The balance is devoted to a number of different objects for the benefit of enlisted men, such as instruction, amusement, etc. "The management is under the direction of the commanding officer and the post ■exchange council of administration, and there are strict regulations for the ■conduct of the business of the exchange.
The funds of the post exchange, while not public moneys within the meaning ■of sections 6488, 5490, 5492 of the Revised Statutes, are entrusted to officers ■of the Army in their official capacity, and a misapplication is punishable under ¡the Articles of War. When practicable, such part of them as is not required for immediate use should be deposited in bank. For an officer in charge of a post exchange to lend its money to anyone would be a gross breach of trust.
The post exchange council, with the approval of the commanding officer, may "bond in a reasonable amount for the proper handling of the funds entrusted to them the post exchange officer and such of the employees of the exchange as may be deemed necessary, and may authorize the employment of an expert ¡accountant at stated intervals to audit the books of the exchange, the expense to be borne by the exchange.